Filed 7/15/26  P. v. Sandifer CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON ISAAC SANDIFER,<br><br>    Defendant and Appellant. | B343905<br><br>(Los Angeles County<br>Super. Ct. No. MA085003) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Emily J. Cole, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

The trial court denied Jason Isaac Sandifer's motion for pretrial mental health diversion under Penal Code section 1001.36,[1] finding diversion was not feasible given Sandifer would be in prison on a prior commitment for at least six more months and that he would pose an unreasonable risk of danger to public safety if treated in the community. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Offense*

In August 2021, while Sandifer was incarcerated in state prison for solicitation to commit murder, correctional officers found a note in his pocket stating he could obtain fentanyl, heroin, methamphetamine, and cell phones. They then found methamphetamine in incoming mail addressed to Sandifer. The envelope listed a return address of a law office. Sandifer admitted authoring the note and stated, "This is on me, I take responsibility for all of it."

In May 2023 officers searched Sandifer after he attempted to enter a housing unit to which he was not assigned. He was carrying a nine-inch-long, one-inch-wide metal cylinder sharpened to a point at one end.

In October 2023 the People charged Sandifer with conspiracy to furnish contraband (controlled substances) (count 1, §§ 182, subd. (a)(1); 4573.9, subd. (a)) and custodial possession of a weapon (count 2, § 4502, subd. (a)). It was further alleged that Sandifer committed the offenses while in state prison (§ 1170.1, subd. (c)) and that he had four prior strike offenses (§§ 667, subd. (d); 1170.12 subd. (b)). Those convictions included

---

[1]     Statutory references are to the Penal Code.

2

three convictions for assault with a deadly weapon (§ 245, subd. (a)(1)) and one conviction for solicitation to commit murder (§ 653f, subd. (b)).  Sandifer pleaded not guilty.

B.    *Sandifer Seeks Mental Health Diversion*

In April 2024 the trial court found Sandifer eligible and suitable to receive services through collaborative drug treatment court.  The court ordered him to enroll in and complete the eight-week Substance Transition and Re-Entry Treatment (START) program in the Los Angeles County Jail run by the Los Angeles Centers for Alcohol and Drug Abuse (L.A. CADA).  However, Sandifer's initial referral to the START program was closed after he was involved in a fight while in custody, which affected his security level.  Once Sandifer's classification level was reduced, the court issued a new START referral, and Sandifer enrolled in and completed the program.[2]  But because Sandifer had pending rules violation hearings based on his two charged offenses that would likely result in losing custody credits and lengthen his time in prison, the prosecution no longer agreed that Sandifer was an appropriate candidate for the collaborative court, and Sandifer's case was transferred to another court for trial.

The same month Sandifer filed a motion for mental health diversion under section 1001.36.  He submitted a psychological evaluation prepared by Dr. Joel Leifer, a court-appointed

---

[2]    According to L.A. CADA, the START program provides up to nine hours a week of substance use disorder counseling (group, individual, and crisis), alcohol and drug education, and case management services.

3

psychologist, who concluded Sandifer met the criteria for diversion under section 1001.36, subdivisions (b)-(c), for count 1.[3]

Leifer opined that (1) Sandifer suffered from a qualifying mental disorder, (2) the disorder played a significant role in the offense charged in count 1 (but not count 2), (3) his symptoms would respond to treatment, and (4) he would not pose an unreasonable risk of danger to public safety if treated in the community.

Leifer diagnosed Sandifer with substance use disorder (alcohol, opioid (heroin), and stimulants (methamphetamine)), post-traumatic stress disorder (PTSD), and generalized anxiety disorder. Sandifer had a "severe form" of substance use disorder, which began with using alcohol at age 10 and progressed through his 20s to abusing morphine, oxycodone, heroin, and methamphetamine. Leifer opined that Sandifer's substance abuse had been "an integral factor in his criminal history." Leifer determined Sandifer's PTSD stemmed from being sexually abused as a teenager while in custody, stabbed twice in prison, and repeatedly assaulted while living on the streets. Sandifer described an ongoing fear of similar assaults that affected both

---

[3] The supplement to Sandifer's petition for diversion that contained Leifer's report indicates it was proposed to be filed under seal in the trial court, but the record on appeal does not include a motion to seal or a sealing order as required by California Rules of Court, rule 8.46(b)(2). Moreover, Sandifer's publicly available brief quotes and summarizes Leifer's report extensively. Accordingly, we do not deem the report "a record sealed by order of the trial court" and determine we need not file a public version of this opinion that redacts references to the contents of Leifer's report. (Cal. Rules of Court, rule 8.46(b)(2), (g).)

4

his sleep and waking life and was exacerbated by incarceration. Sandifer's generalized anxiety disorder caused "excessive worry, irritability, muscle tension, sleep disturbance, and elevated heart rate." Leifer also noted that Sandifer had spent 11 days in a mental-health crisis bed in May 2023 and had been prescribed antipsychotic and anti-anxiety medications.

Leifer reported Sandifer's mental disorders played a significant role in count 1 (conspiracy to furnish controlled substances in prison) because Sandifer suffered from a "chronic, and unremitting addiction to substances." As to count 2 (possession of a shank), however, Leifer found no evidence that Sandifer's mental illness contributed to the offense. Specifically, Leifer indicated he "found no documentation describing any symptoms of Mr. Sandifer's mental illness playing a role in this offense. Moreover, at the time of our interview, in his description of the facts surrounding this offense, [Sandifer] failed to describe experiencing any symptoms of a mental disorder that would play a significant role in this offense."

Leifer stated Sandifer's symptoms would respond to treatment. He attributed Sandifer's continued substance use while incarcerated to "the lack of intensive drug treatment available in the prison system." And the psychotropic medication regimen provided while he was incarcerated was "inadequately mitigating his psychiatric symptoms (anxiety, post-traumatic stress)." Sandifer reported he was currently taking the medication Sublocade by injection and it was helping him to manage his cravings for drugs. However, Leifer concluded that Sandifer required a more comprehensive treatment program than what he was receiving in prison.

5

Sandifer had received drug treatment from 2007 to 2010 (presumably while out of custody) as well as residential treatment at Henry Ohloff House.  Sandifer had typically relapsed shortly after discharge from treatment, but Leifer attributed those relapses to a lack of "ongoing support and supervision."  Leifer noted Sandifer wished to return to the same residential treatment at Henry Ohloff House, and Leifer agreed placement there would be appropriate provided the program "executes the recommendations" in Leifer's report.

Those recommendations included "[c]omprehensive, residential dual diagnosis (psychiatric/substance abuse) treatment" that was "long term" and "highly structured."  The necessary treatment components included weekly individual therapy, group psychotherapy two to three times per week, substance-abuse counseling several times per week, psychiatric medication management (consisting of weekly meetings with a psychiatrist at first, tapered down to monthly once Sandifer was stabilized), cognitive-behavioral strategies for pain management and anxiety reduction, and drug testing.

Leifer concluded that "if Mr. Sandifer is treated in the community that addresses these components [of his suggested treatment plan], he would not pose an unreasonable risk of danger to public safety" and is "unlikely to commit a super-strike."  Leifer reported that Sandifer demonstrated insight into his criminal history, substance abuse, and the challenges he would face in maintaining sobriety.  Leifer also noted Sandifer had strong family support from relatives in Louisiana and Florida, and he had two longtime friends in recovery who would support him.

Sandifer submitted a letter from L.A. CADA confirming he had completed the START program. Sandifer "actively participated in group sessions," "was respectful and receptive to the material," "acknowledge[d] the severity of his addiction[,] and recognize[d] that his drug/alcohol use has been influenced by the lack of coping skills and knowledge of what having a[n] addiction means." The letter also noted Sandifer "expressed interest in continuing treatment upon his release."

At the January 29, 2025 hearing on the diversion motion, defense counsel indicated he originally expected Sandifer to have a parole hearing that month but now Sandifer would not be considered for parole until June 2025. Counsel noted he had provided the court with a letter from the Amity Foundation (Amity), but the record does not contain that letter. Defense counsel stated he believed Amity had "treatment programs in the jail," and then once Sandifer was paroled, Amity would help Sandifer "with a placement."

The People opposed Sandifer's motion, arguing he would not respond to treatment, as evidenced by his numerous refusals to come to court, and would pose an unreasonable risk to public safety if treated in the community. The People highlighted his 2017 conviction for solicitation to commit murder. The People also argued there were "serious practical problems" with placing Sandifer on diversion because he would be released in June 2025 at the earliest, if his in-prison rules violations did not result in him serving additional time.

The trial court denied Sandifer's motion. The court explained: "The Court is going to deny the motion for mental health diversion on two bases. The Court does find the defendant is an unreasonable risk of danger to public safety; and, second

7

that he is unsuitable for mental health diversion.  First, it's not just the current charges which, also, in the conspiracy, include fentanyl, but also his prior history and his history in state prison of dangerousness."

Second, the court explained that for the next six months, Sandifer would still be in prison and would have to "seek out Amity … on his own.  He can't be ordered like a residential treatment.  He would have to go to Amity, agree to go to Amity.  He would have to be housed in a different setting.  And just by what I've witnessed of Mr. Sandifer over the last year of maintaining his case, I do not think that he would go and do those things with his constant refusals.  And the way that I've observed Mr. Sandifer, he would absolutely not do that."  The court noted Sandifer's many past refusals to come to court, and the fact that the court had to order him brought to court in a safety chair for the diversion hearing after having to make two extraction orders for the previous day.  The court concluded, "I don't find him suitable for the treatment whatsoever."

After the court denied diversion, the People offered Sandifer the middle term of three years on count 2 in exchange for dismissal of count 1 and the strike allegations.  Sandifer pleaded no contest to count 2.  The court sentenced him to a three-year term to run consecutively with his current term.  The court dismissed count 1 and the remaining allegations in the interest of justice under section 1385.

Sandifer timely appealed, and the trial court granted his request for a certificate of probable cause.[4]

---

[4]     A defendant may appeal the denial of pretrial diversion following a plea of guilty or no contest by obtaining a certificate of

## DISCUSSION

A. *Governing Law and Standard of Review*

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals with qualifying mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626; *People v. Tourville* (2026) 120 Cal.App.5th 439, 451 (*Tourville*).) The court may postpone prosecution, either temporarily or permanently, to allow the defendant to receive mental health treatment. (*Frahs*, at p. 626; *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*).) "The Legislature intended the mental health diversion program to apply as broadly as possible." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*); see *Frahs*, at p. 632.)

A defendant must be both eligible and suitable for mental health diversion. A defendant is eligible under section 1001.36, subdivision (b), if (1) a qualified mental health expert has diagnosed the defendant within the last five years with a mental disorder identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (with limited exceptions); and (2) the defendant's mental disorder was a significant factor in the charged offense. (See *Vaughn, supra*, 105 Cal.App.5th at p. 133; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).)

A defendant is suitable for diversion under section 1001.36, subdivision (c), if four requirements are met: (1) a qualified mental health expert opines the defendant's mental disorder would respond to treatment; (2) the defendant consents to

_____

probable cause. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147; *People v. Padfield* (1982) 136 Cal.App.3d 218, 228.)

9

diversion and agrees to waive speedy trial rights; (3) the defendant agrees to comply with treatment; and (4) if treated in the community, the defendant will not pose an "unreasonable risk of danger to public safety" as defined in section 1170.18. (§ 1001.36, subd. (c)(1)-(4); see *Sarmiento, supra*, 98 Cal.App.5th at pp. 891-892.)  The defendant bears the burden " 'to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion.' " (*Vaughn, supra*, 105 Cal.App.5th at p. 134.)

"Assuming the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 892; see § 1001.36, subd. (f)(1)(A)(i); *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.)  "This is not an additional eligibility or suitability requirement the defendant must meet.  Rather, subdivision (f)(1) of section 1001.36 read as a whole appears to contemplate an ongoing assessment to assure that defendants will receive appropriate treatment for their particular conditions as part of the diversion program." (*Sarmiento,* at p. 892; accord, *People v. Russo* (2026) 121 Cal.App.5th 134, 138 (*Russo*); *Vaughn, supra*, 105 Cal.App.5th at p. 134.)  "Finding the treatment would not meet defendant's specialized health treatment needs is an appropriate basis to deny diversion, assuming there is no abuse of discretion with the analysis." (*Russo*, at p. 139.)

Finally, even if the defendant makes a prima facie showing that he or she meets the express statutory requirements, the trial court retains residual discretion to deny diversion.  (*People v.*

10

*Cabalar* (2025) 117 Cal.App.5th 41, 53; *Sarmiento, supra*, 98 Cal.App.5th at p. 892.)  This residual discretion must be exercised " ' "consistent with the principles and purpose" ' " of the mental health diversion statutes.  (*Vaughn, supra*, 105 Cal.App.5th at p. 135.)

We review the trial court's grant or denial of a motion for mental health diversion for abuse of discretion.  (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *Whitmill, supra*, 86 Cal.App.5th at p. 1147.)  A court abuses its discretion when it makes an arbitrary decision by applying the wrong legal standard or bases its decision on express or implied factual findings that are not supported by substantial evidence.  (*Vaughn*, at p. 135; *Whitmill*, at p. 1147.)  " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence," ' " but the inferences " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork." ' "  (*Vaughn*, at p. 135.)

B.    *The Court Reasonably Concluded Sandifer Would Not Receive the Necessary Treatment While Completing His Prior Sentence for His Prior Offense*

To grant mental health diversion, the trial court must be "satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant."  (§ 1001.36, subd. (f)(1)(A)(i); see *Vaughn, supra*, 105 Cal.App.5th at p. 134.)

In his report, Leifer recommended a comprehensive, long-term, "highly structured" residential dual diagnosis treatment program for Sandifer.  Necessary treatment components would include weekly individual therapy, both group psychotherapy and substance-abuse counseling several times per week, weekly

11

meetings with a psychiatrist, learning cognitive-behavioral strategies, and drug testing. Leifer concluded that if Sandifer's treatment plan included these components, Sandifer was unlikely to commit a super strike.

At the hearing on the diversion motion, the prosecution expressed "serious practical problems" with the planned treatment, particularly given it was possible Sandifer would serve even longer than six more months after facing consequences for his prison rule violations based on the conduct underlying his new charges. Defense counsel acknowledged Sandifer would not be eligible for release on parole for six months. Defense counsel stated he "believe[d]" Amity had treatment programs in the prison that Sandifer could attend, and Amity would help find a placement for Sandifer once he was paroled. He stated, "I don't know if [Sandifer's] security level … will need to drop if he is sent back to prison in order to parole and to make that happen, but that is what we would request. I think the court does have the ability to have him sent back to state prison to deal with his [rules violations] and to also attempt to engage in treatment. I can definitely, as he approaches his parole date, work on finding appropriate programs, working with the parole department, or working with the resources that I have available here."

The trial court shared the prosecution's concern that, for at least the first six months of diversion, Sandifer would be in prison. During that time he would have to seek out treatment at a program on his own: "He can't be ordered like [at] a residential treatment." Further, based on Sandifer's "constant refusals" to come to court over the past year during which the court had overseen his case, it did not believe he would avail himself of the

12

available treatment. The court noted he had to be brought to court in a safety chair for the diversion hearing after previous orders that he be extracted from his cell (following a series of refusals) were unsuccessful.

Although the trial court couched its comments as pertaining to Sandifer's "suitability" for diversion, the court's reasoning "mirrored the analysis under section 1001.36, subdivision (f)(1)(A)(i)," which requires that the trial court be satisfied that the recommended treatment program would meet the defendant's specialized mental health treatment needs. (*Russo*, *supra*, 121 Cal.App.5th at p. 139.) In its recent decision in *Russo*, the Court of Appeal dealt with a similar situation, in which the trial court "explicitly found defendant was 'not suitable' for diversion," but the court's reasoning reflected an analysis under section 1001.36, subdivision (f)(1)(A)(i), of the adequacy of the defendant's proposed treatment. (*Russo*, at p. 139) Although the trial court "conflated that analysis with the suitability analysis," the appellate court determined the trial court did not abuse its discretion in denying diversion because the proposed treatment would not meet the defendant's specialized health treatment needs: the defendant proposed to return to the very same program he had completed before and then relapsed, and did not identify anything that would be done differently the second time. (*Id.*, at pp. 139-140.)

Similarly, the trial court here did not abuse its discretion in denying Sandifer's request for mental health diversion on the basis that Sandifer would not receive necessary treatment for at least the first six months of his diversion while he continued to serve out his prison term, prior to being paroled. The court could reasonably conclude the treatment available to Sandifer in prison

13

would not be the type of comprehensive, highly structured residential treatment program that Leifer determined was essential for Sandifer's success. Indeed, Leifer attributed Sandifer's continued substance use while incarcerated to "the lack of intensive drug treatment available in the prison system" and determined Sandifer was not able to receive a proper psychotropic medication regimen in prison.

Sandifer contends that the court abused its discretion in noting Sandifer's frequent refusals to come to court, including several times for the hearing on his motion seeking diversion, and suggesting he was not likely to avail himself of the limited treatment options that might be available in prison. He contends his successful completion of the START program demonstrates he was motivated to engage in treatment.

Sandifer refused to come to court on at least nine different dates, not counting a number of missed court dates that were deemed excused because Sandifer claimed he was sick. All were after Sandifer had completed the START program and had been taking prescribed medication that he said was helping him. While Sandifer was successful in the START program, he made no showing that a program comparable to the highly regarded START program in Los Angeles County jail would be available to Sandifer in prison. Defense counsel told the court he believed Amity had programs in prison, but he provided no specificity regarding those programs and no evidence such program existed. Further, Leifer's report noted Sandifer's history of relapsing after past treatments and attributed this to a lack of "ongoing support and supervision." The court reasonably determined such supervision would not be provided in prison.

Even if the court improperly considered Sandifer's pattern of refusing to come to court as evidence that Sandifer was not likely to be proactive and successful in treatment offered in the prison system, the fact remains that the in-prison treatment would not meet the parameters that Leifer deemed necessary for Sandifer's success. Accordingly, the court did not abuse its discretion in denying diversion because Sandifer would not receive appropriate treatment in prison.

C. *The Trial Court Did Not Abuse Its Discretion in Concluding Sandifer Was Likely To Commit a Super Strike If Treated in the Community*

The court's second basis for denying diversion was that Sandifer would pose "an unreasonable risk of danger to public safety." A defendant is not suitable for diversion if the court determines he or she will "pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) The court did not abuse its discretion.

" 'An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means " 'an unreasonable risk that the [defendant] will commit a new violent felony' " within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are "colloquially referred to as 'super strikes.' " [Citation.] "Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14." ' " (*Tourville*, *supra*, 120 Cal.App.5th at p. 452; accord,

15

*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679; *People v. Graham* (2024) 102 Cal.App.5th 787, 799 ["[A] defendant is not suitable for diversion if the defendant is 'too dangerous to be treated in the community because he [or she] would commit a new violent super strike.' "].)  In determining whether the defendant is likely to commit a super strike, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)  The defendant need not be charged with a super strike for the trial court to determine he or she is likely to commit a super strike in the future.  (*People v. Bunas* (2022) 79 Cal.App.5th 840, 861-862.)

Sandifer contends the trial court "never made a finding that [he] was likely to commit a 'super strike' offense as required by the statute's definition of dangerousness."  The court found Sandifer posed "an unreasonable risk of danger to public safety." Sandifer is correct that the trial court did not expressly find Sandifer was likely to commit a super strike, but the statute does not require the court to use those precise words.  "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

The record supports the determination the trial court understood the narrow meaning of the "danger to public safety" suitability factor under section 1001.36, subdivision (c)(4). Leifer's report stated "[t]he court can be satisfied that the person is unlikely to commit a super-strike if granted diversion."

Sandifer's motion cited the correct statutory definitions of "unreasonable risk [of danger to public safety]" and argued Sandifer "does not pose an unreasonable risk of committing a 'super-strike' if treated in the community." These arguments were included under a heading stating, "The Court Must Find that the Defendant Does Not Pose an Unreasonable Risk of Committing a 'Super-Strike' if Treated in the Community." Similarly, the People's opposition stated that "[i]n order to grant diversion, the Court must be satisfied that the individual will not pose an unreasonable risk of danger to public safety under Penal Code section 1170.18, if treated in the community. … ' "Public Safety' is narrowly defined: 'unreasonable risk of danger to public safety' means an unreasonable risk that the defendant will commit a new violent felony. (See [§] 667 subd. (e)(2)(c)(iv).)"[5] Based on this record, we presume the trial court applied the correct statutory standard and impliedly found that Sandifer was likely to commit a super strike if treated in the community. (See *People v. Moine* (2021) 62 Cal.App.5th 440, 449-451 [analyzing whether record supported "the trial court's implied finding that [the defendant] was likely to commit a super strike offense" following denial of diversion "on the ground that [the defendant] was too dangerous to be treated in the community"].)

Substantial evidence supports the trial court's determination on this suitability factor. First, the court was

---

[5] The People also argued that "crimes (other than super strikes) can be unreasonably dangerous to public safety." However, as discussed, the People acknowledged in defining the relevant legal standard that the risk to public safety was "narrowly defined' and cited to the applicable provision in section 667.

concerned about Sandifer's lengthy prior history of violent crime. (See § 1001.36, subd. (c)(4) [in assessing danger to public safety, courts may consider "the defendant's violence and criminal history"].)  In 2005, he was convicted of assault with a deadly weapon.  In 2017, he sustained two additional convictions for assault with a deadly weapon from conduct on two different occasions.  He also had been convicted of unlawfully causing a fire of a structure.  And at the time of the current offenses, Sandifer was serving a 16-year prison sentence for solicitation to commit murder, itself a super-strike enumerated in section 667, subdivision (e)(2)(C)(iv)(V).  (See *People v. Valencia* (2017) 3 Cal.5th 347, 351 fn. 3.)  Given this history of serious and violent conduct, the trial court did not abuse its discretion in finding Sandifer posed an unreasonable risk of committing a future super-strike offense.  (Cf. *People v. Williams* (2021) 63 Cal.App.5th 990, 1003 [court abused its discretion in finding defendant was likely to commit a super strike in part because he had no prior criminal record]; *People v. Moine*, *supra*, 62 Cal.App.5th at p. 451 [record did not support finding defendant was likely to commit a super strike in part because "[n]one of [defendant's] past convictions involved a violent felony, let alone a super-strike felony"].)

Second, the court relied on the circumstances of the current offenses.  (See Pen. Code, § 1001.36, subd. (c)(4) [court may consider "current charged offense" in determining if defendant is likely to commit a super strike]; *People v. Graham*, *supra*, 102 Cal.App.5th at p. 799 [court may consider nature and circumstances of the charged crimes]; accord, *People v. Bunas*, *supra*, 79 Cal.App.5th at pp. 861-862.)  Count 2 involved Sandifer's possession of a nine-inch sharpened weapon in prison.

Sandifer points to his PTSD diagnosis and argues "the totality of the circumstances indicates that appellant had the weapon because of his PTSD and general anxiety disorder, not merely because he had a propensity for violence." However, it is not irrational to infer that Sandifer possessed the weapon for violent and non-defensive purposes, particularly given that correctional officers found it on him as he improperly attempted to enter a housing unit that was not his own. (See *Vaughn, supra*, 105 Cal.App.5th at p. 135 [substantial evidence includes circumstantial evidence and any reasonable inferences drawn from evidence].)

Finally, the court appropriately considered Sandifer's conduct while incarcerated in determining whether he was likely to commit a super strike. (§ 1001.36, subd. (c)(4) [court may consider defendant's "violence ... and any other factors that the court deems appropriate"].) While housed in the local jail pending trial, Sandifer's participation in the START program was initially delayed because he was involved in a fight, resulting in a higher security classification. Although Sandifer later lowered his security risk and completed the program, the incident nevertheless demonstrated ongoing concerns regarding Sandifer's violent behavior and his ability to participate in treatment safely and effectively. Taken together, Sandifer's violent criminal history, his current incarceration for solicitation to commit murder, his possession of a sharpened weapon in prison, and his recent custodial misconduct constitute substantial evidence supporting the trial court's implied finding that he posed an unreasonable risk of committing a future super-strike offense if treated in the community.

## DISPOSITION

The judgment is affirmed.


                                    STONE, J.


We concur:



MARTINEZ, P. J.



FEUER, J.